GORSUCH, Circuit Judge,
Scott Eizember left a Tulsa jail intent on settling a score. He was upset with his ex-girlfriend, Kathy Biggs, because she had tipped off authorities about his violation of a protective order. So just as soon as he could he made for her hometown of Depew. Once there, he noticed an elderly couple leaving a house across the street from Ms. Biggs’s home. Mr. Eizember decided the place would make an ideal lookout for Ms. Biggs and, after the couple left, he broke in. But A.J. and Patsy Cantrell didn’t stay away as long as Mr. Eizember hoped, and when they returned home they found him pointing their own shotgun at them. A tense exchange followed but eventually things calmed down enough that Mr. Eizember set the gun down. It was then Mr. Cantrell saw his opportunity. He grabbed the gun and fired. The shot hit Mr. Eizember in the hand — but also tragically struck and killed Mrs. Cantrell. In what followed, Mr. Eiz-ember wrestled the gun away from Mr. Cantrell and proceeded to beat him with it until he fell unconscious. Then Mr. Eiz-ember dragged the Cantrells’ bodies into *1134 the bathroom, where Mr. Cantrell was left to — and did — die.
The Cantrells’ deaths proved only the beginning of things. Next, Mr. Eizember headed across the street, shotgun in hand, toward Ms. Biggs’s house. Her son, Tyler Montgomery, saw him coming and tried to run, but before he could Mr. Eizember shot him in the back. Then Mr. Eizember turned on Mr. Montgomery’s nearby grandmother, Carla Wright, and beat her with the shotgun too. Somehow in the midst of this melee Mr. Montgomery recovered enough to run out of the house and into his pickup truck. Mr. Eizember followed right behind, jumping into the truck bed. Mr. Montgomery drove off erratically, hoping to shake Mr. Eizember, but he wouldn’t be budged and even shot Mr. Montgomery again. Eventually Mr. Montgomery crashed into a pole, jumped out, and ran for help. Mr. Eizember headed in the other direction and managed to hitch a ride. When the driver grew suspicious, though, Mr. Eizember fired a shot at him too and leapt from the car.
For the next eleven days Mr. Eizember went to ground. Hiding in wooded areas around Depew — resurfacing only to steal clothes and a pistol from a nearby house— he succeeded in evading a police dragnet. But in time he realized he needed to make a break for it. So he stole a car he found outside a church, somehow eluded police lines, and made his way out of town. Soon, though, the car ran out of gas, leaving Mr. Eizember to continue his odyssey hitchhiking.
Continue it he did. Seeing Mr. Eizem-ber on the roadside, Dr. Sam Peebles and his wife, Suzanne, stopped and offered him a lift. But as soon as he was settled in the ear, Mr. Eizember turned his pistol on the couple and ordered them to drive him to Texas. The journey lasted hours. Finally, during a roadside break in Texas, Dr. Peebles drew his own revolver and shot Mr. Eizember. .Mr. Eizember replied by wresting the revolver away and bludgeoning Dr. Peebles with the pistol he’d stolen back in Oklahoma. Then Mr. Eizember tried to shoot Mrs. Peebles. When the pistol wouldn’t fire, he struck her in the head instead and ran off. But it seems the wounds Dr. Peebles inflicted eventually caught up with Mr. Eizember. At a nearby convenience store the clerk heard he’d been shot and called the police. It was only then that the authorities at last arrested Mr. Eizember, taking him first to a hospital to recover, and, in time, to Oklahoma for trial.
A jury there found Mr. Eizember guilty of more than a few crimes: first-degree murder for Mr. Cantrell’s death, second-degree felony murder for Mrs. Cantrell’s death, assault and battery with a dangerous weapon for the attack on Mrs. Wright, shooting with intent to kill for the attack on Mr. Montgomery, and first-degree burglary for breaking into the Wrights’ home. For the first-degree murder charge, the jury found two aggravating circumstances — that Mr. Eizember knowingly created a great risk of death to more than one person and that the murder was especially heinous, atrocious, or cruel — and sentenced him to death. For all the rest, the jury or judge settled on lesser sentences.
Mr. Eizember’s various challenges to his convictions and sentences have so far proven unfruitful. The Oklahoma Court of Criminal Appeals rejected his direct appeal in Eizember v. State, 164 P.3d 208 (Okla.Crim.App.2007), and the United States Supreme Court denied certiorari, Eizember v. Oklahoma, 552 U.S. 1269, 128 S.Ct. 1676, 170 L.Ed.2d 374 (2008). The OCCA separately denied postconviction relief. Eizember v. State, No. PCD-2005-371 (Okla.Crim.App. Aug. 20, 2007). As did a federal district court. Eizember v. *1135 Trammell, No. 08-CV-00377-C, 2013 WL 6670275 (W.D.Okla. Dec. 18, 2013). But in the district court Mr. Eizember did manage to obtain a certificate of appealability permitting him to raise a number of issues in this court and it is to them we now turn.
First and primarily, Mr. Eizember argues that the state trial court should have excluded two jurors — known in these proceedings by their initials, D.B. and J.S.— because they were impermissibly biased in favor of the death penalty. The trial court’s failure to dismiss them, he says, renders his death sentence invalid. But both the OCCA and the federal district court disagreed with this conclusion. And because the OCCA addressed this claim of error on the merits (as it did all the claims Mr. Eizember now raises), the Antiterrorism and Effective Death Penalty Act of 1996 permits us to afford relief for putative legal errors only if we can say the state court’s decision was either “contrary to” or “an unreasonable application of’ clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Mr. Eizember’s habeas petition and his appeal to this court focus solely on the latter question, accepting that the OCCA “identifie[d] the correct governing legal rule” but disputing whether the court “unreasonably applie[d] [that rule] to the facts” of his case. Williams v. Taylor, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
What is the Supreme Court’s clearly established rule in this area? In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court held that “the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” Id. at 424, 105 S.Ct. 844 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). So, by way of example, the Court has recognized that someone “who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances” (as the law requires) and thus necessarily fail the Witt standard. Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Still, the Court has cautioned, that’s only an example: Witt’s substantial-impairment test isn’t limited only to those jurors who would automatically vote one way or the other. See Witt, 469 U.S. at 424-26, 105 S.Ct. 844.
At the same time, the Court has stressed that the trial judge is best positioned to determine whether a potential juror will be able to follow his or her instructions' — and that a court of appeals removed from the live proceedings must afford significant deference to the trial judge’s assessments. In the Supreme Court’s telling: “Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it,” including not only what they say but also their “nonverbal communication”— factors all of “critical importance in assessing the attitude and qualifications of potential jurors.” Uttecht v. Brown, 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007).
How do these established standards play out when we’re called on to review not a federal trial court on direct appeal but the reasonableness of a state’s application of federal law on collateral review? In Brown the Court explained that a federal court owes what we might fairly describe as double deference: one layer of deference because only the trial court is in *1136 a position to assess a prospective juror’s demeanor, and an “additional” layer of deference because of AEDPA’s “independent, high standard” for habeas review. See id. at 9-10, 127 S.Ct. 2218. Indeed, the Court stressed that where, as here, the record reveals a “lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful voir dire, the trial court has broad discretion” on the issue of exclusion. Id. at 20, 127 S.Ct. 2218.
With these standards in mind, we turn first to Mr. Eizember’s challenge to juror D.B. Mr. Eizember argues that D.B.’s answers to a written questionnaire show she should have been excused. For this he relies primarily on the following six responses: .
42. Have you ever formed an opinion either in favor or against the death penalty? If so, explain.
Yes X No_

I firmly believe if you take a life you should lose yours.

61. What are your feelings about the death penalty? Please explain:

1 have no reservations about seeing someone put to death so long as it has been proven the person is guilty, especially if they have taken the lives of others.

62. What purpose do you think the death penalty serves in our society?

Keéps taxpayers from having to support a criminal for the remainder of their life

63. Do you think the death penalty in Oklahoma is used too often or too seldom?

Definitely not too often.

64. Check the “one” statement which “best” summarizes your general views about capital punishment (the death Penalty):
_1. I am opposed to capital punishment under any circumstances.
_2. I am opposed to capital punishment' except, in a few cases where it may be appropriate.
_3. I am neither generally opposed, nor generally in favor of capital punishment.
_4. I am in favor of capital punishment, except in a few cases where it may not be appropriate. X 5. I am strongly in favor of capital punishment as an appropriate penalty.
73. If you were Mr. Eizember or the State of Oklahoma would you want yourself as a juror In this case? Yes (_) No (X)

Because if I feel guilt has been proven, I would not hesitate to impose the death penalty.

These responses, Mr. Eizember argues, show that D.B. couldn’t fairly consider all three sentencing options for first-degree murder (death, life without parole, and life with the possibility of parole) and had to be excluded.
Besides, even if these answers don’t suffice to show that much, Mr. Eizember claims that D.B.’s colloquy with his lawyer during voir dire certainly does. During that exchange, counsel asked D.B. whether she would be able to consider a sentence of life without parole. “If the death penalty was not an option, yes,” she replied. Asked to elaborate, she reasoned: “If they’re in prison for the remainder of their life without a possibility of parole why not the death penalty?” The exchange continued: .
[Q]: All right, so are you, are you telling me then that if you had a situation where it was laid out on the table, life, life without parole or death, *1137 then you would automatically consider one of those?
[A]: Automatically consider one of—
[Q]: One of those punishments over the others?
[A]: Probably.
[Q]: And—
[A]: Yes.
[Q]: And that would be death?
[A]: Yes.
After counsel clarified the posture under which D.B. might have to make such a decision — only if and after the jury found the defendant guilty of intentional murder — he again asked whether she “would automatically say it should be the death penalty.” D.B. responded that she “would have to look at all three but just off the cuff, it would probably be death,” explaining too that she “would have to try hard” to endorse life without parole.
While acknowledging that Mr. Eizem-ber’s concerns about D.B. are hardly trivial, the OCCA held that the trial court didn’t commit reversible error when it decided to retain her as a juror. As a threshold matter, the OCCA explained, the questionnaire must be understood in context: it asked potential jurors to share their views on capital punishment before voir dire began and before the court could explain the potentially available punishments, the factors that must be considered when choosing one, and the need to find and weigh aggravating and mitigating circumstances before imposing a death sentence. Eizember, 164 P.3d at 220-21. So, the OCCA held, the questionnaire cannot be “considered in isolation.” Id. at 221. Instead, the court reasoned, it must be viewed in conjunction with the potential juror’s responses to live questions at voir dire after the court instructed the prospective panel members about the law’s demands. And broadening its view to take in “the totality of [D.B.’s] voir dire, written and oral responses,” the OCCA saw adequate support for “the trial court’s finding that Juror D.B. did not have such a strong bias towards the death penalty that the performance of her duties as juror would be prevented or substantially impaired.” Id. at 226.
Beginning with the questionnaire, the OCCA noted that Mr. Eizember focused on certain questions and answers but neglected others. For example, Mr. Eizem-ber overlooked responses that “indicate[d] Juror D.B. could be a fair and impartial juror.” Id. at 225. Like this one:
65. Assume you are on a jury to determine the sentence of' a defendant who has already been convicted of a very serious crime. If the law gives you a choice of death or life imprisonment, or some other penalty: (check only one)
_1. I could not vote for the death
penalty regardless of the facts and circumstances of the case.
_2. There are some kinds of
cases in which I know I could not vote for the death penalty even if the law allowed me to, but others in which I would be willing to consider voting for it.
X 3. I would consider all of the penalties provided by law and the facts and circumstances of the particular case.
_4. I would usually vote for the
death penalty in a case where the law allows me to.
_5. I would always vote for the
death penalty in a case where the law allows me to.
The court noted that Mr. Eizember similarly overlooked responses from voir dire — again, after D.B. had been instructed on the law — suggesting that she could and would consider all three sentencing options and all mitigating and aggravating *1138 circumstances. The transcript shows D.B. confirming — repeatedly—that she could “consider all three punishments,” Voir Dire Tr. 20708, 233; that she would follow the court’s instructions and would not enter deliberations with a preconceived outcome, id. at 236-37; that she “could put aside any personal beliefs or predispositions,” Eizember, 164 P.3d at 224; and that she “did not have any moral, ethical or religious obligations that would keep her from” following the court’s directions, id.
Beyond this, the OCCA held, the voir dire responses on which Mr. Eizember most relied weren’t as damning as he suggested. For example, the court reasoned that D.B.’s “response that ‘off the cuff she would consider death as punishment for intentional murder” merely “illustrate[d] a ‘gut reaction.’ ” Id. at 225. The court said it was “confident that any determination made during jury deliberations would be an informed decision and not merely ‘off the cuff.’ ” Id. And, recalling that the trial court had “the benefit of observing D.B.’s demeanor throughout voir dire,” the OCCA concluded that “the trial court did not abuse its discretion in refusing to remove her for cause.” Id. at 226.[1]
We cannot say, as Mr. Eizember asks us to, that this decision represents an unreasonable application of the Supreme Court’s clearly established federal law precedents, especially in light of the double deference we owe. Some of D.B.’s questionnaire responses do seem to suggest a bias in favor of the death penalty. But the questionnaire contains‘other responses that undercut that conclusion and suggest a willingness to consider all the aggravating and mitigating facts and all the available penalties. As the OCCA emphasized, too, D.B.’s questionnaire responses came before she received instructions about the law’s demands and addressed her ability to follow them at voir dire. During the three days of voir dire proceedings that followed — spanning 507 pages of transcript — the trial court had the opportunity to view D.B. firsthand and assess her demeanor, the tone of her oral responses, and her reactions to the law as instructed. And here many more of D.B.’s statements suggest a willingness to follow the court’s directions and keep an open mind. To be sure, even at this stage her statements remain something of a mixed bag. It may even be that the trial court could have lawfully chosen to dismiss D.B. Or that the OCCA could have lawfully chosen to reverse the trial court’s decision to retain D.B. But none of that necessarily means the OCCA unreasonably upheld the trial court’s firsthand finding that D.B. was a qualified juror. Before us are an inconclusive factual record and a highly deferential legal standard: a combination that precludes us from forming the conviction necessary to deem the OCCA’s decision an unreasonable. application of federal law. When it *1139 comes to juror exclusion, the unavoidable fact is that the Supreme Court has left considerable room for trial court discretion, a discretion AEDPA only magnifies in the context of federal court review of state court decisions, and the resulting spectrum of permissible or reasonable judgment is large indeed.
We find confirmation of our judgment on this score in the fact that other federal courts have applied relevant Supreme Court precedent much as the OCCA did in this case, upholding trial court decisions to retain jurors in the face of mixed responses very much like D.B.’s — and even in the face of responses arguably more doubtful. See, e.g., United States v. Fulks, 454 F.3d 410, 428 (4th Cir.2006) (holding that a juror’s statement that he would vote for the death penalty “90 percent of the time” did not “require his exclusion”); Bowling v. Parker, 344 F.3d 487, 519-21 (6th Cir.2003) (finding no constitutional error where the trial court seated a juror who “initially state[d] that he would automatically give the death penalty to those who met the aggravating factor” but “later ... expressly said that he would consider mitigating evidence,” id. at 520). To say the OCCA unreasonably applied federal law in this case we would likely have to say these courts did the same in their cases. The alternative conclusion — that the Court’s precedents leave considerable room for discretion and that all these courts have at least reasonably applied its precedents— strikes us as far more likely.
Turning to Mr. Eizember’s complaint about juror J.S., we confront a much easier case. In attempting to show J.S. was impermissibly biased in favor of the death penalty, Mr. Eizember again points to several questionnaire responses:
61.What are your feelings about the death penalty? Please explain:

Pro-Death

Depending on the crime committed

62. What purpose do you think the death penalty serves in our society?

Takes repeat offenders out of civilized society.

63. Do you think the death penalty in Oklahoma is used too often or too seldom?

About right

64. Check the “one” statement which “best” summarizes your general views about capital punishment (the death Penalty):
_1. I am opposed to capital punishment under any circumstances. _2. I am opposed to capital punishment except, in a few cases where it may be appropriate.
__3. I am neither generally opposed, nor generally in favor of capital punishment.
/ 4. I am in favor of capital punishment, except in a few cases where it may not be appropriate.
_5. I am strongly in favor of capital punishment as an appropriate penalty.
73. If you were Mr. Eizember or the State of Oklahoma would you want yourself as a juror in this case? Yes (_) No (/)

If guilty, he will be on death row and eventually executed.

But like D.B., J.S. checked the option next to “I would consider all of the penalties provided by law and the facts and circumstances of the particular case” when asked about his ability to vote for the death penalty. And like D.B., once advised at voir dire of the three possible punishments for a first-degree murder conviction and the law concerning their application, J.S. replied that he could consider all three and would follow the court’s instructions. Neither, unlike D.B., did J.S. offer any comments during voir dire that *1140 might seem to cut in the other direction. The OCCA concluded that J.S.’s responses “showed he did not hold views regarding punishment that would prevent or substantially impair the performance of his duty as a juror in accordance with his instructions and oath as a juror.” Eizember, 164 P.3d at 223. And having concluded that the OCCA’s resolution of the Witt question wasn’t unreasonably wrong when it comes to D.B., we must necessarily do the same on this lesser record when it comes to J.S.[2]
Our dissenting colleague suggests that we don’t need to reach the question whether the OCCA reasonably applied Witt to the facts of this case because that court didn’t apply Witt at all — at least when it came to juror D.B. Instead of asking whether D.B.’s views “prevent[ed] or substantially impair[ed]” the performance of her duties as Witt requires, the dissent suggests that the OCCA asked an entirely different question: whether D.B. would automatically vote for the death penalty because she was “irrevocably committed” to that outcome. In this way, the dissent reasons, the OCCA relied on an incorrect legal standard and so its decision was “contrary to” clearly established federal law. For our part, we are unable to subscribe to this line of argument for various reasons.
First is the fact Mr. Eizember never made it. AEDPA says that we may undo a state court decision either if it employed a rule of law “contrary to” what the Supreme Court has prescribed or if it “unreasonably applie[d]” the correct legal rule to the particular facts before it. Williams, 529 U.S. at 412-13, 120 S.Ct. 1495 (quoting 28 U.S.C. § 2254(d)(1)). The Supreme Court has long recognized that a state court’s identification of the correct governing legal standard and the reasonableness of its application of that standard to the facts are two distinct statutory inquiries. See id. Indeed, petitioners frequently will accept that the state court identified the correct rule of law and challenge only the reasonableness of its application of that rule to the particulars of the case at hand, thus bypassing the first AEDPA inquiry and inviting the reviewing court to proceed directly to the second. See, e.g., Parker v. Scott, 394 F.3d 1302, 1308 (10th Cir.2005) (proceeding to the question of reasonable application where there was no argument that the court’s decision was “contrary to” clearly established law); Etherly v. Davis, 619 F.3d 654, 661 (7th Cir.2010) (same); Collado v. Miller, 157 F.Supp.2d 227, 231 (E.D.N.Y.2001) (same). That is exactly what happened in this case. In six and a half years of proceedings in federa] court Mr. Eizem-ber never argued, as the dissent now does, that the OCCA employed a legal standard “contrary to” Witt. Instead and accepting that the OCCA eorreetly identified Witt as the governing standard, Mr. Eizember has argued only that the OCCA’s application of that standard — the answer it gave to the question Witt poses — was unreasonable given the facts in this particular case. Because there’s nothing in Mr. Eizember’s district court petition resembling the argument the dissent now seeks to advance on his behalf, he forfeited such a contention there. See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1128 (10th Cir.2011). And because there’s nothing in his opening *1141 brief in this court raising the argument either, it is independently waived here. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir.1998).
To be sure, the dissent faults the district court for failing to address the question whether the OCCA applied a rule of law contrary to Witt. The dissent also faults the State for failing to address the question on appeal. The dissent even faults the State’s appellate brief for failing to observe any potential forfeiture and waiver problems attending the argument. But it seems to us that the fact no one has ever addressed the argument the dissent wishes to press should be a clue. A clue that this just isn’t a case where the district court missed an issue' presented to it or where the petitioner expressly sought to introduce a new issue on appeal and the State might have been expected to offer a response in its appellate briefing. A clue that this is a case instead where an appellate dissent seeks to devise a new ground for reversal for the petitioner that the petitioner has never pursued for himself in a great many filings over a great many years of litigation.
Indeed, the dissent’s considerable efforts to prove that Mr. Eizember presented and preserved its argument before the district court and this one do more to confirm the opposite conclusion in our view. The dissent’s citations to Mr. Eiz-ember’s pleadings in district court show him reciting the § 2254(d)(1) standard and then proceeding to make the same argument he does here, the same argument we’ve addressed above, the argument that the OCCA unreasonably applied Witt to the facts in this record surrounding jurors D.B. and J.S. See Dissent at 1159-60. Precisely none of the dissent’s citations shows him arguing that the OCCA employed a legal standard contrary to Witt and we simply cannot fault the district court for failing to see what wasn’t there. When it comes to Mr. Eizember’s appeal, the dissent plucks (and repeats) two sentences from his 80 page opening brief in which Mr. Eizember first notes the OCCA’s observation that D.B. wasn’t “irrevocably committed to any one punishment” and then proceeds to comment flatly that this “is not the correct standard.” See Dissent at 1159 (quoting Appellant’s Br. at 28). But these two sentences, the very best the dissent can do to show preservation in all of Mr. Eizember’s pleadings before this court or the district court, say no more on the question whether the OCCA identified the correct Witt standard. In fact, they stand surrounded by argument and in a section of the brief expressly challenging the reasonableness of the OCCA’s application of Witt to the facts of this case, not its identification of that case or its governing legal standard. And this court has repeatedly instructed that stray sentences like these are insufficient to present an argument (let alone one forfeited below) in a way that might fairly inform opposing counsel or a court of its presence in the case. See Grant v. Trammell, 727 F.3d 1006, 1025 (10th Cir.2013) (“Even a capital defendant can waive an argument by inadequately briefing an issue....”); Fairchild v. Trammell, 784 F.3d 702, 724 (10th Cir.2015) (same).[3]
*1142 Second, it turns out that there’s a very good reason why the capable lawyers in this case never made the dissent’s argument: it lacks merit.[4] The Supreme Court has repeatedly reminded us that “AED-PA’s requirements reflect a ‘presumption that state courts know and follow the law.’ ” Woods v. Donald, — U.S. -, 135 S.Ct. 1372, 1376, 191 L.Ed.2d 464 (2015) (per curiam) (quoting Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)). This presumption demands that federal judges “afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.” Id. Reading the OCCA’s opinion, it quickly becomes clear this is not such an extreme case. The OCCA cited Witt no fewer than five times. It began its discussion of the juror bias question by quoting Witt’s substantial impairment test and recognizing it as the “proper standard.” Eizember, 164 P.3d at 221. And in concluding its analysis of D.B.’s responses, the court expressly held that she “did not have such a strong bias towards the death penalty that the performance of her duties as juror would be prevented or substantially impaired” — language that tracks Witt almost verbatim. Id. at 226; see Witt, 469 U.S. at 424, 105 S.Ct. 844.
The dissent acknowledges all this. Neither does the dissent dispute that the OCCA both correctly identified and reasonably applied Witt’s standard when it came to juror J.S. Still, the dissent suggests, the OCCA somehow missed the very same governing legal standard when addressing juror D.B. By way of support and again, the dissent points to a sentence in which the OCCA offered its view that D.B. was not “irrevocably committed” to the death penalty. This sentence, the dissent argues, proves the OCCA applied an erroneous legal standard. But the Supreme Court itself has acknowledged that showing a juror’s irrevocable or automatic commitment is one quite legitimate, if surely not exclusive, way to satisfy the Witt standard for impermissible bias. See supra at 1135-36. Neither did the OCCA stop there, for it continued on and explained its additional view that D.B. would not be “substantially impaired” in her ability to consider all the penalties the law provides— thus squarely addressing the alternative method of satisfying the Witt standard. See Eizember, 164 P.3d at 226. In light of all the evidence that the OCCA applied Witt when it came to D.B., just as it did *1143 when it came to J.S., and in light of the respect AEDPA requires us to afford our state counterparts, it would be quite wrong to give talismanic weight to the OCCA’s passing — and entirely pertinent — observation on the way to its essential conclusion. Under AEDPA we must assume a state court is applying the correct federal legal standard even when it mentions no legal standard at all. See Witt, 469 U.S. at 431, 105 S.Ct. 844; Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Surely we must as well assume the state court is applying the correct federal legal standard when it tells us it is— and when viewed fairly it appears to be— doing just that. Any other course would evince a serious disrespect for state courts, run afoul of the federalism and comity concerns that undergird AEDPA, and risk inviting reversal for misapplication of that statutory scheme. See, e.g., Parker v. Matthews, — U.S. -, 132 S.Ct. 2148, 2152, 183 L.Ed.2d 32 (2012) (per curiam) (summarily reversing a grant of habeas relief because the state court had relied on a ground that was “sufficient” under federal law, even though it had also relied on an independent “ground of questionable validity”).
Third, even if we were to adopt Mr. Eizember’s argument it would only mean AEDPA deference no longer applies and we must engage in a Witt analysis ourselves. See Trammell v. McKune, 485 F.3d 546, 550 (10th Cir.2007). And even without the additional layer of AEDPA deference, Brown would still require us to afford significant deference to the trial court’s decisions on the question of juror bias. 551 U.S. at 9, 127 S.Ct. 2218. Given that — and given the ambiguous record concerning D.B.’s views — we would still find ourselves without a lawful basis to overturn the trial court’s first-hand assessment that she could fairly discharge her duties as juror. Indeed and again (though not acknowledged by the dissent), other circuits have upheld trial court decisions to retain potential jurors on records that are, if anything, a good deal more favorable to the defendant than the one before us. See supra at 1138-39 (discussing Fulks, 454 F.3d at 428; Bowling, 344 F.3d at 519-21).[5]
Moving from arguments about jury selection to arguments about jury instructions, we face a due process question. Everyone agrees that Oklahoma law provides three possible sentences for first-degree murder: death, imprisonment for life without parole, or imprisonment for life with the possibility of parole. Okla. Stat. Ann. tit. 21, § 701.9(A). But Mr. Eizember argues that the jury was confused about the meaning of the third option — what the State calls a “straight” life sentence. He contends that, thanks to a prospective juror’s erroneous comment during voir dire, the jury pool was left with the misimpres *1144 sion that a “straight” life sentence could give way to parole in seven or twenty years. In fact, he tells us, Oklahoma law requires someone sentenced to “straight” life to serve at least thirty-eight years in prison before becoming parole eligible. Mr. Eizember says the trial court never adequately cleared up this confusion among members of the jury and the result was a violation of a federal due process guarantee articulated in Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). To remedy this violation, he claims, we must at least vacate his capital sentence.[6]
Simmons held that “[w]here the State puts the defendant’s future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury — by either argument or instruction — that he is parole ineligible.” 512 U.S. at 178, 114 S.Ct. 2187 (O’Connor, J., concurring in the judgment); id. at 168-69, 114 S.Ct. 2187 (plurality opinion) (same). Simply put, Simmons prevents a state from giving the jury at the sentencing phase in a capital case “a false choice between sentencing [the defendant] to death and sentencing him to a limited period of incarceration.” Id. at 161, 114 S.Ct. 2187 (plurality opinion).
We don’t see how the OCCA clearly misconstrued or unreasonably misapplied Simmons. After all, no one questions that the jury was correctly instructed that life without parole was an option in this case. And no one questions that the jury was correctly instructed that life without parole means precisely that. So even assuming the jury was confused about the consequences of a “straight” life sentence, it just “was not faced” with the “false choice” the Court faced and condemned in Simmons. Eizember, 2013 WL 6670275, at *15 (mem. op. at 28). Indeed, it seems to us that Mr. Eizember can’t and doesn’t complain so much that the OCCA misapplied Simmons as that the OCCA should have extended its reasoning to-the situation presented here. In his view, the Constitution should be read to ensure not only that a capital jury is properly instructed about the availability and meaning of life without parole. Instead, he says, the Constitution should also be read to guarantee that a capital jury is properly instructed about the details of a “straight” life sentence where parole is a possibility. The problem is that, under AEDPA, this court is authorized to intervene only when state courts fail to apply the Supreme Court’s existing and clearly established teachings reasonably, not when they fail to extend them in new and novel ways. White v. Woodall, — U.S. -, 134 S.Ct. 1697, 1706, 188 L.Ed.2d 698 (2014) (emphasizing that AEDPA “does not require state courts to extend [Supreme Court] precedent or license federal courts to treat the failure to do so as error”).
Mr. Eizember next attempts an even more ambitious version of his Simmons argument. So far he’s suggested only that his capital sentence should be vacated because the trial court didn’t instruct the jury that a “straight” life sentence guaranteed him at least thirty-eight years in prison. Now he argues that this same failure requires us to vacate his first-degree murder conviction and perhaps his noncapital *1145 convictions and sentences too. But where is the clearly established federal law compelling such a conclusion? We can’t find it in Simmons, a case that (again) addressed only what a jury must be told when deciding a sentence for a capital crime&emdash;and a decision that does not clearly apply to the guilt phase or to non-capital sentencing proceedings. Neither can we find it in Shafer v. South Carolina, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001), another case Mr. Eizember cites, because Shafer expressly confirms our understanding of Simmons’s reach. See id. at 51,121 S.Ct. 1263 (“It is only when the jury endeavors the moral judgment whether to impose the death penalty ... that Simmons comes into play&emdash;”).
Besides these two cases most of Mr. Eizember’s argument in this direction is predicated on state&emdash;not federal&emdash;juris-prudence. He contends that Oklahoma law entitled him to a correct instruction about the parole consequences of a “straight” life sentence. And he faults the OCCA for failing to apply Oklahoma law correctly in this respect. But even assuming without granting that Mr. Eizember is right about all this it does little to help him&emdash;for, again, this court’s role on collateral review isn’t to second-guess state courts about the application of their own laws but to vindicate federal rights. Estelle v. McGuire, 502 U.S.- 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).
True, in the course of his extended state law discussion Mr. Eizember does cite in passing two more federal cases still. The first is Hicks v. Oklahoma, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), where the Supreme Court held that the federal due process guarantee sometimes requires states to abide their own procedural rules, at least when those rules create a “substantial and legitimate” liberty interest. Id. at 346,100 S.Ct. 2227. The second is Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941), which recognized that every trial must observe principles of “fundamental fairness” to satisfy due process. Id. at 236, 62 S.Ct. 280. But, as the State correctly notes, Mr. Eizember didn’t advance any federal law argument under Hicks or Lisenba before the district court and he has, accordingly, forfeited any argument based upon them in this court. See Wilburn v. Mid-South Health Dev., Inc., 343 F.3d 1274, 1280-81 (10th Cir.2003). Neither for that matter does Mr. Eizember even fairly develop a Hicks or Lisenba argument in this court. Yes, he cites the decisions in passing during an extended state law discussion, but he never attempts to explain either how a state law instructional rule' about parole consequences creates a substantial liberty interest under federal law or how such a rule might be required to render any criminal trial fundamentally fair. Or how Supreme Court precedent might clearly compel such conclusions in a way that would satisfy AEDPA. And it’s settled law that insufficient briefing of this áórt will serve to waive an issue in this court even if it was fairly presented and preserved in the district court. See Grant, 727 F.3d at 1025.
Mr. Eizember next challenges the trial court’s jury instructions on the charges related to Mr. Cantrell’s death. The state trial court instructed the jury on first-degree “malice aforethought” murder and two separate lesser-included offenses: second-degree “depraved mind” murder and second-degree felony murder. See Okla. Stat. Ann. tit. 21, §§ 701.7(A), 701.8. But by everyone’s admission the court misstated Oklahoma law in reciting the elements of “depraved mind” murder, erroneously informing the jury that it couldn’t convict Mr. Eizember of that offense if he intended to kill or harm his victim. While *1146 intent to kill does preclude a conviction for “depraved mind” murder under state law — compelling instead a first-degree murder conviction — mere intent to harm does not. See Eizember, 164 P.3d at 235. Here Mr. Eizember has, as well, sought to link this state law error to the violation of federal right, contending that the error amounted to a violation of his federal due process rights under Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).
How so? In Beck, the Supreme Court held that “when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense — but leaves some doubt with respect to an element that would justify conviction of a capital offense — -the failure to give the jury the ‘third option’ of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.” 447 U.S. at 637, 100 S.Ct. 2382. This risk, the Court held, is intolerable in capital cases, so a state is “constitutionally prohibited from withdrawing that option from the jury.” See id. at 637-38, 100 S.Ct. 2382. And, according to Mr. Eizember, this exact risk manifested itself in his trial: the trial court’s error in instructing the jury on “depraved mind” murder pushed the jury toward an unwarranted first-degree murder conviction for Mr. Cantrell’s death. Of course, by his own admission the jury still had before it another lesser-included offense — felony murder — on which the trial court issued unchallenged instructions. But, Mr. Eiz-ember argues, we should hold this insufficient to satisfy Beck. In his view, that case should be read as requiring not only that the jury receive some noncapital option but the best noncapital option, the one most fitting to the defendant’s theory of the case — and here, he argues, that meant “depraved mind” murder.
Mr. Eizember’s Beck argument, however, confronts a challenge in Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). There the jury was instructed on “robbery murder” (a capital offense) and second-degree murder (a non-capital offense). The defendant argued that he was also entitled to a plain-old robbery instruction as well. But the Court disagreed, even though the trial court’s failure to instruct on robbery meant the jury couldn’t return a verdict that was consistent with the defendant’s preferred theory of the case. Id. at 647, 111 S.Ct. 2491. The Court explained that Beck doesn’t guarantee multiple lesser-included offense instructions or the defendant’s favorite such instruction. Instead, it simply precludes an “all-or nothing choice between the offense of conviction (capital murder) and innocence.” Id.
It seems to us Mr. Eizember finds himself in much the same position as the defendant in Schad. Here, as there, the jury did not face an all-or-nothing choice but was instead presented with the required “third option.” After all, even without a proper second-degree “depraved mind” murder instruction, the jury in this case still had at hand a viable, noncapital, lesser-included alternative if it was unconvinced that Mr. Cantrell’s killing rose to the level of first-degree murder: it could have convicted him of felony murder. So because “the court instruet[ed] the jury on one lesser included offense supported by the evidence,” Beck was not clearly implicated for AEDPA purposes “even if instructions on other lesser included offenses might have been warranted.” Bland v. Sirmons, 459 F.3d 999, 1016 (10th Cir.2006).
Retreating now, Mr. Eizember argues that the evidence in this case was legally insufficient to support a felony murder conviction for the death of Mr. *1147 Cantrell. In this way, he says, felony murder just wasn’t a legally viable option for the jury and a Beck problem persists even after Schad is taken into account. But it’s hard to see how the OCCA’s determination otherwise was unreasonable. Mr. Eizember himself requested the felony murder instruction — and usually, of course, a party cannot later claim that a jury instruction given at his request was given in error. See Parker v. Champion, 148 F.3d 1219, 1221-22 (10th Cir.1998). Besides, there’s plenty of reason to think the evidence at trial could have supported a felony murder conviction for Mr. Cantrell’s death. After all, Mr. Eizember himself argued at trial that he didn’t intend to kill either of the Cantrells. The jury apparently accepted this very argument when it came to Mrs. Cantrell, for it convicted Mr. Eizember of felony murder for her death. It’s undisputed, too, that the homicidal acts resulting in both victims’ deaths were separated by a few seconds and a few feet. So there’s every reason to suppose that if the jury believed Mr. Eiz-ember’s claim he didn’t intend to kill Mr. Cantrell when he hit him with the gun, it also “could have found Mr. Cantrell’s murder occurred during the course of a burglary” — and thus constituted felony murder — just as it “found with Mrs. Cantrell’s murder.” Eizember, 164 P.3d at 235; see also Wade v. State, 581 P.2d 914, 916 (Okla.Crim.App.1978) (noting that under the felony murder doctrine in Oklahoma “the accused can be found guilty of murder even though the killing is unintentional”). To be sure, the evidence didn’t compel a conclusion that Mr. Cantrell’s death was unintentional and better described as felony murder than first-degree murder, but neither did it foreclose that conclusion and to know that much is to know no clear Beck error transpired here. See Eizember, 164 P.3d at 235-36; Eizember, 2013 WL 6670275, at *19-20 (mem. op. at 37-40).[7]
*
Finally, even if failing to give a proper instruction on second-degree “depraved mind” murder wasn’t itself a constitutional violation under Beck, Mr. Eizember submits his attorney’s failure to object to the instruction on state law grounds amounted to constitutionally ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This argument, however, requires no extended discussion to resolve. Everyone acknowledges that, to prevail under Strickland, a defendant must show his lawyer’s putative error prejudiced him. Yet, as the OCCA observed, even supposing Mr. Eizember’s attorney had secured a proper instruction on (unintentional) “depraved mind” murder, the jury would have been legally obliged to reject it anyway. That’s because a “depraved mind” murder conviction in Oklahoma is unavailable as a matter of state law when the jury finds a killing intentional beyond a reasonable doubt — precisely what the jury did here when it convicted Mr. Eizember of first-degree murder. See Eizember, 164 P.3d at 235; see also Okla. Stat. Ann. tit. 21, § 701.8(1). In this way, the OCCA observed, trial counsel’s failure to object to the “depraved mind” murder instruction ultimately had no impact on Mr. Eizem-ber’s substantial rights. Neither has Mr. Eizember identified any flaw in this reasoning or any Supreme Court authority suggesting that this assessment is a clear *1148 ly impermissible or unreasonable application of Strickland’s prejudice test and we are aware of none.[8]
The judgment of the district court is affirmed.

. The OCCA noted that it reviewed Mr. Eiz-ember’s objection to juror D.B. only under the plain error standard because, to preserve a complaint about a trial court's failure to dismiss a juror for cause, a litigant in Oklahoma state court must apparently exercise' a peremptory challenge. See Eizember, 164P.3dat 223. This naturally raises the question whether the state court's use of the plain error standard affects the degree of deference we owe its decision — or whether it might provide an adequate and independent state law ground that precludes our review. See Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). At least under this court’s precedents, however, if a state court on plain error review denies relief on a federal claim by deciding there was no federal law error at all — the course the OCCA chose in this case — our standard AEDPA standards apply. See Douglas v. Workman, 560 F.3d 1156, 1177-78 (10th Cir.2009) (per curiam).

. Lingering around the edges of Mr. Eizem-ber’s argument here is the implication that J.S.'s willingness to reschedule his rotator cuff surgery to serve on the jury should raise a red flag. But the OCCA held that J.S.'s response "merely indicated a willingness to do his civic duty.” Eizember, 164 P.3d at 223. And Mr. Eizember doesn’t develop any argument or point to any part of the record that would allow us to declare that conclusion unreasonable.

. Faced with'this problem, the dissent adds a further reply at the tail end of its opinion. Here it claims it isn’t inventing for Mr. Eiz-ember an argument that the OCCA applied a legal standard "contrary to” federal law but only arguing that the OCCA "unreasonably applied” the correct federal legal standard to the facts of the case. See Dissent at 1160. This new reply, however, emerging at the end of the dissent, is pretty hard to square with all the argument that comes before it. See id. at 1156 (contending that “the OCCA applied an incorrect legal standard”); id. (alleging that the OCCA "applied a legal standard that is inconsistent with clearly established federal law”); id. át 1158 (asserting “the OCCA’s 'irrevocably committed’ standard is not the *1142 same as, and indeed is less demanding than, the controlling standard outlined in Witt ”); id. at 1160 (arguing that the state court “was applying the OCCA’s own 'irrevocably committed’ standard, rather than the Witt/Adams standard”). By any reasonable reckoning the dissent contends that the OCCA committed error by using a legal standard contrary to federal law when assessing juror D.B. And by any reasonable reckoning nothing like that argument appears anywhere in Mr. Eizem-ber's materials. Unable to shake this reality, the dissent retreats further and at the very close seems finally to suggest that, even if Mr. Eizember has never made its argument, we should. See id. at 1161. But as we’ve seen, the Supreme Court has recognized that the “contrary to” and "unreasonable application” questions are distinct statutory questions and courts routinely move to the second question when the first isn't in dispute. See supra at 1140-41. Neither does the dissent offer any argument or authority suggesting that this court may or should sua sponte on appeal develop an argument for reversal on the first question that a habeas petitioner has not ever himself pursued. Nor could it for, as we've seen, governing law is to the contrary, holding that even a capital defendant may forfeit or waive arguments by declining to pursue them anywhere in a litigation as long lived as this one. See Grant, 727 F.3d at 1025; Fairchild, 784 F.3d at 724.

. The discussion of this second concern attending the dissent’s line of argument represents the opinion of Judge Gorsuch only.

. After denying deference to the state appellate court under AEDPA, the dissent seems to suggest it owes no deference to the state trial court under Brown because it too applied the wrong legal standard. But as proof the dissent cites only questions the court asked potential jurors — not the legal standard the court used when assessing their responses. And where, as here, "the record does not indicate the standard applied by a state trial judge, he is presumed to have applied the correct one.” Witt, 469 U.S. at 431, 105 S.Ct. 844. Besides, many of the trial judge's questions suggest a full understanding of Witt (for example, asking jurors whether they could “consider” or “fairly consider” all three legally available punishments). And in any event and again, the dissent here presses an argument for Mr. Eizember that he’s never pressed for himself. Here we don’t even have two stray sentences from Mr. Eizember: his briefing before the district court and this court nowhere suggests that the trial court misidentified the governing law. Any claim along these lines would therefore appear long forgone.

. At times Mr. Eizember’s brief suggests that the jury’s confusion violated not only his due process rights but also his rights under the Sixth and Eighth Amendments. But when it comes to citing a Supreme Court case that articulates the "clearly established” law he would have us apply Mr. Eizember offers just Simmons, a case that situates the right in question in the Due Process Clause of the Fourteenth Amendment.

. In his reply brief Mr. Eizember contends for the first time that the evidence at trial was legally insufficient to permit the jury to find him guilty of second-degree burglary, the predicate felony for a felony murder conviction in this case. This argument appears too late in these proceedings and is therefore waived. See Bronson v. Swensen, 500 F.3d 1099, 1104-05 (10th Cir.2007).

. Mr. Eizember argues we should reverse a? well in light of "cumulative error” — suggesting that we aggregate all errors in his case found to be harmless and analyze their effect when considered together. But the circuits are split on "whether the need to conduct a cumulative-error analysis is clearly established federal law” for AEDPA purposes' — and this court’s position on the question is murky at best. Hooks v. Workman, 689 F.3d 1148, 1194 n. 24 (10th Cir.2012). Fortunately we again find we don’t need to answer the question directly: even if Mr. Eizember could overcome this problem, we have identified here no harmless federal law errors to accumulate.